No. 21-1233, et al. National Religious Broadcasters Noncommercial Music License Committee Appellant v. Copyright Royal Jewelry and Librarian of Congress. Just before we begin, I wanted to give all counsel a heads up that there is a chance that we will need to take a short break at some point during these arguments, so don't be surprised if it's nothing you've done if we suddenly say we're going to take a quick recess. And with that, good morning, and we're happy to begin. Thank you, Erin. May it please the Court, Samantha Jacobson on behalf of Petitioner NAB. In the decision below, the Copyright Royalty Board found that custom radio services like Pandora should be subject to an identical rate to broadcast radio stations that simply transmit their over-the-air content on the Internet. That's so even though simulcasts are in all relevant respects identical to the over-the-air broadcasts that Congress exempted from having to pay royalties because they understood that record sales. And even though Pandora is very similar to on-demand services like Spotify, the Congress understood to pose the greatest threat to record sales. Critically, the Board offered no affirmative explanation of how simulcasts and custom radio are the same along the statutory criteria. Rather, the linchpin of the Board's reasoning was that even if simulcasts and custom radio are different, the two types of service should still have the same rate because simulcasts and custom radio services did not show that they were, as a rule, different from every other kind of webcasting service. Specifically, the Board focused in on this third category of so-called Internet radio and found that NAB had not shown that simulcasts and Internet radio were sufficiently different. So why should simulcast radio have a different rate than Internet radio? Why should it have a different rate than Internet radio? I think that there are reasons. I mean, the only evidence in the record on Internet radio came from our own expert, and he explained that Internet radio is not a significant part of the market, and also that it's much more similar to custom radio in the sense that it allows pausing and skipping of songs, in the sense that it's not subject to FCC regulations, and it doesn't have the same kind of content. But I do think the error is more fundamental, which is, even if that were the case, it doesn't really matter whether, from our perspective, whether Internet radio has the same rate as custom radio, has the same rate as simulcasts, or has something in the middle. What really matters is whether or not these two studies that are different, so long as that's your criteria, custom radio and simulcasts, can have the same rate. But why do you get to define which differentiation there should be? I mean, the rate applies to all of the category of radio stations or webcasters, and you're choosing a subset to compare to simulcasters, but the rate applies to all of them. Yeah, I mean, I think the board's reasoning seems to think there was such a thing as the general rate, and, you know, sort of anchored it at the idea that there should be a uniform rate for everyone. But I don't think the statute really contemplates that. The statute says, at first, such rates and terms are distinguished among the different types of service and standard operations. So the board's first responsibility is to basically categorize the market into the relevant types, and then make a differentiation between those. And then it can sort of go on to do its willing buyer and willing seller analysis. The board's assumptions seem to be that you start with the quote-unquote general rate, and then anyone who wants to depart from the general rate has a burden of proof, which I don't think is necessarily true. And then it then ratcheted up that burden of proof to say, not only do we have to show with, you know, different to custom radio, we have to show a different to everything, including, incidentally, the category. Can you identify anywhere in our precedent where we have said that the board has to proceed kind of in this two-step analysis that you are outlining here, where you first kind of define the types of services in the respective categories? And then, after you've done that, you determine, basically, what the willing buyer and willing seller would pay for each of those respective types or the relevant type of service. Is that an issue? Yeah. I don't think it really is an issue, so that hasn't been laid out in that way. But I think what the bulletin of Web 4 is sort of similar with respect to the non-commercial and commercial, and I have to put it in subscription. It does sort of figure out, in its D, why they have sort of different types, and then it figures out what the rate is. So it does do this analysis, and I think one of the aspects that's sort of troubling here is that it didn't, you know, it never subjected that differentiation to the as-of-rule requirements or anything like that. Isn't there language in intercollegiate that undermines your argument? I don't think they are. I mean, that was the only question on appeal there was whether or not it was, you know, the board, they did make a distinction there between as-reported and subscription, whether that was supported by the record, and I think it could be able to be supported by the record. But this argument about simulcast was never presented to this court, and I think it's sort of a fundamentally different analysis here because, you know, here we effectively were able to provide a significant amount of evidence in the record that showed differentiation between custom radio and simulcast, and there was absolutely no evidence. I mean, remarkably, no evidence on the other side. I mean, just to sort of check. Did you show that William Byers, William Sellers would pay a different rate for simulcast rather than internet radio or custom radio? I think we absolutely showed that we would pay a different rate to custom radio. I mean, every single... But, again, you were arguing for the board to give you a different rate than custom radio and the rate assigned to internet radio. So, there was a rate that they were going to give, and you were carving yourself out from the rest of the commercial non-subscription webcasting. And so, what evidence was there? So, we never took a position on what rate internet radio should have. All of our arguments and all of our evidence was targeted on the idea. No, but the board has had this category. You know, they've done the different types that the statute calls for, and they've broken them into, I mean, obviously, terrestrial radio is a known thing, and then they've got the commercial non-subscription webcast, obviously the commercial subscription webcast, and then the non-profit webcasting. And those are the categories they've used, and those have been grounded in judgments, not just about the nature of the services, but how those services affect the market and what people would be willing to buy and sell at. And what you now want to do is split up that commercial non-subscription category into at least two categories. And you can say, I don't know, maybe it should be three. We didn't talk about that. But if you're going to at least break off, you are arguing to break off into maybe its own category, simulcasting. And so, if you're going to break off simulcasting into its own category, if that would be your that there's a willing buyer-seller differentiation between simulcasting and the leftovers, the existing category that you weren't touching, which was internet radio and custom radio. So, where was that evidence? I think we absolutely did that, Your Honor. So, every single market-based deal that was introduced in this case, that 16 different licensing agreements between iHeartRadio and the record labels all did exactly this. They carved out simulcasting as a separate category from internet radio and from custom radio. And they had an inferiorly lower rate for simulcasting than they did for custom radio. Did the board credit that evidence? The board analyzed that evidence in respect to whether or not the exact rate was appropriate. But the more fundamental point is, this is basically a control. So, the board credits your evidence as establishing that a willing buyer-seller would pay less for simulcast than for internet radio. Wait, I'm just going to finish a sentence. They would pay less for simulcast than they would pay for the remaining category, which is internet radio and custom radio. Where is that finding? I think the board did credit that that was a problem because there's no dispute that every single record deal that was entered into the evidence did differentiate in exactly that way. And these iHeart deals are basically a controlled experiment. iHeartRadio has a simulcasting service and it has a custom radio service. And the PROs, for example, this is all evidence that came into the record office, went to the PROs, went to iHeart and said, you're going to need to increase the rate for custom radio. But they didn't say you're going to have to increase the rate for simulcasting. And the rates in the PRO agreements, which cover 90% of the musical works worthy, almost doubled. That's the link in the internet radio whole there in the analysis, if you're distinguishing the custom radio and yours. Well, it is a sum of evidence that custom radio is being treated differently than simulcast and ultimately that's the question. Are these the same and do they warrant the same rate? But if you look at the licensing agreements, they break them into multiple categories, including internet radio. And one of the PRO agreements similarly does that. It treats internet radio as a separate category. Or it could be three categories, is your position. I think it's totally fair for that to be three categories. I think that is basically how the real world... I mean, these are not terms we made up for litigation. If you look at all the real world negotiations, simulcast, internet radio, custom radio, this is how the real market participants treat it in all the relevant markets, the musical works markets and the direct licensing markets for sound recording. This is the terminology they use. And every 100% contract that is in this record shows differentiation. There's not a single... Your proposal did not break this down into three categories. Your proposal, you compared simulcasters to custom radio and you did not really account for internet radio. And I think that was a problem for the board in their analysis. And so they said, the judges observed and find concern with the fact that while the NAB's proposal seeks to contrast simulcasting with all other statutory webcasting, the NAB chose to more consistently draw a contrast between simulcasting and custom radio services. The proper comparison should be with all statutory commercial webcasting and was insufficiently established. So that's what they found. Now, in oral argument, you're now telling Judge Millett there should be three categories. That wasn't your proposal. I think it would be reasonable for the board to find three categories. What our expert said is that custom radio and internet radio are sufficiently similar that even though they could be treated differently, they could also be treated the same. But we never took a position as to what... And we don't represent internet radio. We never took a position as to what the board should do with internet radio. And sound exchanges used... But the board then said that it was insufficiently established. Your proposal was insufficiently supported. So why is that an abuse of discretion or arbitrary and capricious? Because the board's responsibility under the statute is to explain why custom radio and simulcast should have the same rate. The statute sets up differentiation as being the default. It says that such rates and times should distinguish among the different types of services that are in operation. So the first responsibility of the board is to root the decision in substantial evidence about why along those particular criteria there should be no differentiation. And so if you have two services that are unquestionably different, they shouldn't have the same rate just because one of those services hasn't proven that they're also different from another service. I'm happy to... Wait, I'm sorry. I apologize to both of you and to you as well. But apparently our simulcast equipment is not working right now. So we're going to have to take a break until that is prepared. I apologize. So everybody remember where you were. Should I keep standing in? Oh, you can sit down until we come back in. But we'll retain your time. Great. Okay. Thank you. This honorable court is again in session. All right. Sorry, Diggerson. I apologize to everybody for the technical difficulties. Maybe we should be in class by ourselves. Thank you. You may continue. Thank you. So just to get back to where I was, if you just sort of take a step back and look at what the evidence was, it seems like even the board doesn't disagree that the evidence shows that custom radio is different than simulcast. Then to respect the comparison in simulcast and internet radio, all of the evidence similarly shows that they're different. And there's not much evidence. And the reason there isn't much evidence is because internet radio is not a significant feature of this case, just like it hasn't been a significant feature of the market. SoundExchange didn't even introduce any evidence or even mention it until their reply briefs. We knew that it was going to be a critical issue. We'd certainly put in more evidence. But the only evidence came from RxSat and said it's not a significant part of the market and there is difference in simulcast and it is much closer to custom radio. But the board found that all three of these categories were competitors, right? They made that affirmative finding and then that was kind of their proxy for saying that then that kind of willing buyer, willing seller would be the same kind of across the board for all three categories. Isn't that essentially what the board did? I think you could read the board as doing that. I will say so with respect to the competition. I think that is the only affirmative thing that is in the board's opinion. And with respect to that, there wasn't a single fact witness that testified that they were competitors. There wasn't any economic analysis that suggests they were competitors. The luminous testimony said that they didn't compete. And the only thing the board relied on were these references to competition in these FDC and FDC filings. And we had witness after witness go up and look at those documents and say, what we meant by that was competition in the most general sense. One of our witnesses, and this is JA 813 to 817, our executive vice president of strategic planning, said, look, you can think of whiskey and milk as both being beverages. And so they are sort of like in some broad sense competitors, but no one would ever think of them as being competition. And we don't think of custom radio as being our competition. And there was record label executives all testified that they didn't think of, that they viewed broadcast radio and simulcast to be the same, and that they viewed those things to be different from custom radio. But the board did have evidence that it pointed to of sellers focusing on these as competing entities, maybe not competing as head to head as some other ones, but in competition. So what we're really dealing with now is a fact finding by the board. Is that correct? We're dealing with a fact finding by the board here that there was competition. Right? It's a fact finding. I mean, I think it's basically some evidence, but there's no evidence that unreasonable reasoning. It's a fact finding by the board. I'm trying to get you to answer if it's a factual finding by the board that there was competition. I don't know if you would consider it a factual finding. I mean, what it is is the board's reasoning was, we see this information from these filings that call them competitive. And from that, we're going to reason that there's sufficient competition. We're going to conclude that there's sufficient competition. Is the finding of competition a factual finding or a legal ruling? I think it's a legal ruling because I don't think, you know, competition, the question is competition that is relevant to these statutory criteria for the purposes of rate differentiation. And so that's sort of illegal, you know, that this is a level of competition that warrants them to have the same rates. That, I think, is a legal conclusion. I don't think there's, like, you know, X amount of competition or any sort of, like, thing that you could say is a fact finding. I think it's a legal analysis. And that legal analysis was grounded in, you know, the evidence that was extremely thin and contradicted by all the other evidence in the record. Actually, yeah. Can I take that? Go ahead. We interrupted you before, too, so we'll give you another couple of minutes before we get to you. Before I bottle up? Okay. Thank you, Erin. Okay. I have a couple of minutes now. You can have another couple of minutes now, just for a couple of minutes now, and we will give you another couple of minutes. Okay. Okay. It's hard when arguments are interrupted the way it was. Thank you, Erin. I really appreciate it. If you are going to take more time now, then I'd like to ask you to talk more about intercollegiate because I think that that case is very on point here because in that case, similarly, there was a request for the board to make an additional differentiation and it claimed that because there was a difference between small and very small broadcasters, they must differentiate. But the court held that it had to be seen in the lens of whether there'd be something different negotiated in a marketplace between willing buyers and willing sellers. And I think that that's very much on all fours with what's happened here because it seems to me that what the board has done is it has said that you have not established that there's a different market segmentation for simulcasters versus all the other commercial non-interactive webcasters, and therefore, there's not a different willing buyer-seller analysis that would support treating simulcasters differently. Why is it intercollegiate on all fours with this? I guess I think that first half of the analysis wasn't very intercollegiate. There was never this piece of reasoning that basically said, you know, we're going to say that there's going to be a uniform rate and an equity-approved differentiation from some sub-entity of every, you know, we see materially different from every other entity in the market. I think that is what happened intercollegiate because intercollegiate said that there has been a differentiation between commercial and non-commercial. And what the board declined to do was adopt intercollegiate's proposal to make further distinction. That's exactly what you're trying to do here. I think it would be completely fair to not make further distinctions if the record warrants it. I don't think you can say, unless someone proves the difference from every single other entity within a particular category, then sort of as a matter of law, they haven't been able to establish differentiation, even if they have been able to on the evidence show that there are two types of things that the market treats as different types of things that are different in all the respects that the statute cares about, which is the spectrum of does it threaten album sales, is it a different type and quantity of sound recording being played. I think at that point the statute places an affirmative obligation on the board to distinguish between those two things. And I don't think the board can then say, regardless of that difference, even if all the, I mean the board's reasoning is basically, regardless of that difference, even if you show us all the difference in the world, unless you can show a distinction between yourself and a third category, then we're going to give these two things the same rate, even if the evidence just doesn't support it, the market doesn't treat them the same way. And I just think that reasoning is a non-sequitur. I don't see that anywhere in this court's precedent or in the board's prior decisions. In the board's prior decisions, they've looked at the actual categories, they've made a differentiation and then they've said, you know, the evidence doesn't actually warrant a distinction between these two things. You know, the evidence doesn't warrant a distinction between different kinds of non-commercials. That's very different from saying, the evidence actually does warrant a distinction between custom radio and simulcast, but we're still going to give you the same rate because you haven't shown a differentiation from internet radio to third category. You were asking the board, though, to make simulcast sort of its own independent category for this rate, for rate making purposes. Correct? We were saying that it should be different from custom radio. We didn't, you know, if AccuRadio, for example, was originally... The board had created a grouping and it had this grouping of commercial non-subscription webcasting as a group. That's the type that it has had for years and years and years and years. And then you come and say simulcast is different. We shouldn't treat it the same as the rate you have assigned to custom radio, which of course is the rate that's assigned to that broader category that they've had for years and years and years and years. So it seems to me, I know you keep wanting to dance around the internet radio thing, but it seems to me that at bottom, if you weren't arguing about internet radio, then they were being left behind right there with custom radio as far as you were concerned because you weren't representing them, you weren't advocating for them. So what you were trying to do was create simulcast. I understand the arguments because it's a similarity to the rest of your radio. They should have their own rate as opposed to the one that you've got here for this grouping that you've otherwise employed for years and years and years. Correct? Correct. And then what is... Sorry. The reason I ask that is because, and some of this is in the intercollegiate radio, intercollegiate broadcasting case, which has 10 references. At some level, the board has to be worried about increasing the balkanization of these categories because they all cover numerous forms of webcasting. And if the argument is going to be that everything has to be... Anyone that can come up with a good enough differentiation is going to be a category of their own. Suddenly, the board is going to have to come up with 10 times as many rates because there won't be any grouping of anything. You'll be here, internet radio will say, well, we're not them and we're not them. And custom radio will go, well, our subscription service should be one thing and our non-subscription service should be another. Everything's going to fracture. And what is your response to that concern? Yeah, I mean, I don't think it's the concern that the board articulated, but I also think that... Just as a matter of law, given the statutory... Right, you're right. And I think that that would be fair in some context, but it's not in this market because if you look at the PR agreements and the direct license agreements, these are real categories. This isn't just a bunch of people coming into court and saying, we want to be different. This is how the market looks at all of these entities. And it isn't that they're going to be 10. There are just these categories. Internet radio is small, so some of the agreements don't treat it as different from custom radio, but the agreements all treat every single agreement in this record, and that includes all the direct license agreements and all the PR agreements with an entity that has both simulcast and custom radio. And I do think it's key that iHeart is basically a controlled experiment here. Any of the labelers could have gone to iHeart Radio and said, simulcast is the same as custom radio, so they should have the same rate. None of them did. They all said simulcast is different to custom radio. And so I think that underscore is that the market recognizes these are real categories and that it treats them differently as categories. And that is a solid evidence. I don't think the concern about falsification is true on this record. Now, maybe on a different record and a different piece of reasoning by the court, absolutely you could sustain that, but I don't think you could sustain it on this record. Any more questions? All right. Thank you. Thank you again for accommodating our break here. Good morning, Your Honor. Jennifer Utrecht on behalf of the Copyright and Royalty Board and the Library of Congress. This is the first time I will be speaking to you all. I would like to start with a general point to make sure we're all on the same terms. The Copyright and Royalty judges' task here is to analyze a hypothetical market, a market that's never existed because the statutory license was created at the same time that the right to publicly perform sound recordings was created, and to decide what willing buyers and willing sellers who, in theory, would negotiate over this, would agree to. With respect to the NAB's primary argument in this appeal, it is true that the Copyright Act directs that the judges shall distinguish among the different types of services that are in existence when setting reasonable rates. What that means, as the judges have upheld in every proceeding and which has been affirmed by this court, is that there have to be differences in meaningful ways, differences that would lead willing buyers and willing sellers to agree to different rates. What happens in this proceeding is very clear. The judges analyze all of the evidence that the NAB tried to present that the NAB claims showed that they were different from custom radio, and the judges identified two clear problems with this. One was that most of the evidence that they cite, the benchmark agreements that they talked about in this oral argument, the survey evidence that we discussed in our brief, the judges found to be methodologically flawed and didn't actually support a finding that simulcasts were different from custom radio in meaningful ways. And the second problem that judges identified was what you're left with is essentially an extraterrestrial radio has a unique promotional value. You should assume that we also have that. And that's not evidence that's a hypothesis, but more important, as the judges explained, there is this other category of internet radio that looks like simulcasts in all the ways that you have articulated as important. We don't know what to do about that. Your presentation doesn't tell us what we should do about that, so how can we actually say you're different based on this hypothesis that's not actually proven if you're not actually accounting for a significant portion of the market? And we think that that factual determination is well explained and supported by substantial evidence. Why does it matter if they're different from something else? I mean, if you've got two things, if you've got three things, an apple, a pear, and an orange, why does it matter whether the orange also proves that it's also different than the pear? I mean, if it's different from the apple, it's different from the apple, and it doesn't need to prove anything else, right? I'm going to try to answer that question. I think I will get messed up in the specific metaphors, so I apologize for redirecting that to the Copyright Act. I mean, Congress recognized that this webcasting license was going to cover a wide spectrum of services that differ in terms of business models. They're going to differ across lots of different sorts of, you know, in terms of functionality could be one, in terms of what music they play. Every service is going to differ from the other, so it isn't really sufficient to point at two, you know, different sides of the spectrum and say, well, we think this is a difference. You have to show that if you want a separate rate that is unique to you, you have to show that the differences you identify actually would lead willing buyers and willing sellers to give you a different rate as distinguished from these other categories. The judges have to set rates that apply to everyone. They can't just identify, you know, specific individuals who say, well, our business model is slightly different, and because we've shown that our business model is different, we think you should give us a rate, even if willing buyers and willing sellers would not agree with it. So even if I agree with that framing, wasn't it the case in both intercollegiate and sound exchange that the board had affirmative evidence that it could point to that willing buyers and willing sellers had kind of comparable agreements in the two different kind of categories that were sought to be distinguished from each other? But you don't have that here. Instead, the board said, well, we find you have evidence that says that they're comparable, but we don't like your evidence, and we think you're competitors, and so we'll use the competition finding basically as a proxy for a finding that willing buyers and willing sellers would agree to the same thing. Isn't that what happened here, and isn't that kind of pushing this even further in what we've approved? To the contrary, Earl, I think that what the board did here is exactly consistent with the prior decisions that this court has approved in looking at the last webcasting proceeding, the sound exchange decision. The evidence that the judges there cited as evidence that ad-based services and subscription-based services should be treated as different was very, very strong affirmative evidence that there was almost no overlap between the listeners to ad-based services and the listeners to subscription-based services, and that complete differentiation made them different markets, and that very strong evidence is what led the judges to differentiate between those two services. We don't have any evidence that resembles that here, and I know that the NAB has repeatedly said, well, simulcasts are unquestionably different. Well, that's just begging the question. Are they actually different? Where is the evidence that they are different? The NAB had cited, for example, the direct licensing agreements. Well, the judges looked at those direct licensing agreements, and they explained exactly what was wrong with them. The NAB hadn't tried to resuscitate that in this appeal. That would be very obviously a factual question if they were challenging the judge's decision to reject those direct licensing agreements as evidence. They haven't done that. I mean, the board seemed to credit the argument in part by talking about this as a continuum, I think, and it's just common sense, right, as someone who likes music and listens to a lot of music and uses these various types of services. It's a lot different to have a service like a Pandora that you can, say, create a station to play a certain type of music or a certain artist's music, because if you create that station, you're at least likely to hear some of the music that you have in mind on a regular basis, on an intermittent basis, whereas if you just kind of tune into a station, a simulcast of a station of a particular genre that you like, it's really hit or miss. And that goes to the core of what is in the statute that is supposed to be considered, right? Sure, I understand that intuition, that, you know, from a user's perspective, Pandora looks very different from simulcast because there is more functionality. But what the judges reasonably expected here was for the NAB to put on evidence that that differentiation would actually affect the rates that loan buyers and loan sellers would pay, that there would actually be a meaningful difference. And so, you know, looking at one of the statutory factors, for example, the promotional value or substitution effect, well, what that means is that promotional value is how much a service is leading listeners to go out and purchase music, purchase digital downloads. Substitution effect is how much is it taking away from that? How much are users just using the service instead of purchasing music? And to show that you were different from custom radio, we would expect to see evidence of we have a much greater promotional, net promotional effect. Users of our services are purchasing music more than custom radio. We don't have that evidence here. And that's really what the judges said when they analyzed, for example, the survey evidence and the benchmarking. They said, we don't think this actually is methodologically sound. We don't think it actually supports a differentiation between that. That's a factual finding that is based on credibility and determination that the judges are entitled to make. And the second problem, of course, is, you know, even assuming you're right, that there is this difference, which we don't think you've proven, there's this other service that's out there that looks like you in the ways that you say are meaningful. And that in and of itself suggests that you are not entitled to a unique rate because there are services that have these same core features. They say, though, that there's plenty of record evidence that different rates have been offered for simulcast services and, say, something like a custom radio service. There's just a pattern of that. And, you know, the board thought, well, it was just a snapshot. But that's what all of these voluntary agreements are. I would urge this court to look at the judge's final determination on pages 219 to 223, which goes through these licenses and explains why they aren't actually relevant or applicable to the actual market that we're analyzing. The first category of licensing agreements that the NAB introduced were licensing agreements for musical works. That's an entirely different copyright. We're not talking about sound recordings here. And it involves different actors, different copyright owners, the fact that they treat simulcast differently. The judges found that doesn't automatically translate into this world. And the second category were direct licensing agreements between iHeart and very small independent record labels. And the judges said, that's just very, very small. It's not really representative of the overall market. No major record labels are involved. We're looking at tiny actors. And if we're going to just rely on this, we would expect to see more substantial evidence to back it up that, you know, the broader market is actually treating this differently. But, again, these are credibility information that they have made. Do the judges themselves have evidence that the broader market was different? Or is there just a void of evidence in their view? You haven't shown us anything different. So I would... The things that are the same, I suppose, is to reverse that question, the judges made factual findings that webcasters are in fact competing with these other services for listeners, which is an economic consideration. Judges' decisions have explained, both this one and prior decisions have explained, if you are competing for listeners, willing sellers are likely going to want to charge you the same rate because they don't want their listeners leaving a higher-paying service to go to a lower-paying service. How granular was the finding of competition? I mean, to say that, okay, there's this world of free stuff to listen to, profit-making free stuff. And, you know, people may, customers may hop back and forth between them or something. It's that type of competition. But are they competing for the same people? Or is it just... You know, there's the people that are kind of like the Pandora people who really want some more curation. And then there's the people who just turn on or start streaming something. And in their car, they would just turn on the radio. And when they're not in their car, they just start putting something on their phone. And they're just... They're not... They're different... How do we know that they're really competing for the same people? Because Pandora does feel like an entirely different product from, you know, a simulcast of something that is already being broadcast on radio. I have two responses to that, Your Honor. I mean, one, the intuition that Pandora feels different. Again, we would expect to see evidence that that's actually making a difference in the hypothetical market, both in terms of how much the users value that functionality and also how much willing sellers and willing buyers value that functionality. And we don't have that evidence here. And the second problem... The second thing I would like to redirect back to the point I made at the beginning, which is that there is this sort of default assumption. It is a blanket license. The whole point of having this statutory license was for a single rate generally to apply. There is sort of a blank assumption that unless there is strong evidence that you are a different service, there's no reason to distinguish among the rates. And that is what we're missing here. The NAB is trying to flip that and suggest that the burden is on the judges to somehow prove that everything is the same. But that's a scheme Congress set up. Congress treated everything as the same unless the judges decide that people are different. And it's entirely reasonable for the judges to have put the burden on the NAB to show that they are different through factual evidence rather than mere assertions that they should be treated the same as terrestrial radio. Do you know if they're competing for the same people? Is there any evidence like that? We've never gotten this case, the first case, when they were grouped together. I would just start by saying we know that listeners on the Internet, once you have a device that can connect to the Internet, you have a wealth of options. And to be clear, that's very different from terrestrial radio where there is a dial, it only gets at an FM station, and it's limited in location. Once you are on the Internet, you have a wealth of options available to you, and that intuition suggests that you are, in fact, competing for listeners just as a, if we're talking about common sense matters as opposed to evidence. But the evidence here, there's no evidence that listeners are actually preferring simulcast and won't go to other services if simulcast is made. I get the point about no evidence, but what about affirmative evidence that, in fact, when you say there's competition, that they really are materially competing for the same listeners? As far as I'm aware, the only direct evidence as to listener competition was the survey that the judges found to be methodologically flawed, and so I would be hesitant to draw any conclusions from that. You said an absence of evidence is not substantial evidence. Well, again, it's not substantial evidence, but we're starting from the proposition that these services are all the same unless they are different types of services, and the judges have to make the decision, well, what are the different types of services? Well, I mean, I take your statutory point, but there are real limits to it because the statute says they shall distinguish between different types, so the judges themselves have an obligation. They can't sort of go, everybody, we're treating everything as the same. It's very clear here, although the judges follow that statutory obligation, they did distinguish between noncommercial services, subscription-based services, and advertising-based services, and they made that differentiation. I understand there's a figure, so what I'm asking is, did they cast too wide a logical net or too wide an empirical net with the commercial non-subscription webcasting because it just covers such a varied range of services, and only sort of customer preferences? There's no evidence in this proceeding that the ways in which the business models for ad-supported services would actually affect the rates that willing buyers and willing sellers would agree to. That's the judge's task, to distinguish among the rates when those differences would lead All right, and I keep hearing your no evidence, which is a perfectly good point as far as it goes. I was just asking for affirmative evidence of the opposite. I don't think it's going to come as a surprise to judges who identify ways in which they are the same because we start with the premise that they are all services broadcasting over the Internet. They're all broadcasting sound recordings over the Internet. They all have the same business model. They're all then monetized by appealing to advertisers, so in a minute we're competing for advertising dollars. There are lots of ways in which, just as a definitional matter, they are the same as other ad-based services, and the ways in which the NAB has asserted they are different are an assumption that they have a unique promotional value because they're playing the same music as terrestrial radio. That's not proven, and that's enough for this court to affirm. Thank you very much. Thank you. All right. We'll give you, and I apologize, am I saying it right, Mr. Degary's son? Did I say that right? If I didn't, tell me. Yes, that's right. We'll give you about two minutes for rebuttal. Okay. Thank you, and just a full quick point. I do think all the affirmative evidence we just had is all stuff that would apply to everything, not just in the non-interactive realm, but also Spotify. Clearly, there are also things broadcast over the Internet and compete for advertisers, even things like YouTube and Google, and that goes to the problem of the competition evidence. All the evidence that they relied on actually even used those as comparisons, competition in that broadest sense. That's not a relevant kind of competition. I think we just heard a concession, basically, that there's no other kind of affirmative evidence in this case. On this point about this, I think, again, what we heard was that there's a strong assumption in favor of a uniform rate, and I just don't read the statute that way. The statute doesn't make that assumption that there's going to be a uniform rate. The statute starts with saying that there should be a differentiation. So then the question is, what do you do when you have something like Internet radio? You know, the CRB, under Michael Arnott's administration, has the subpoena power to subpoena non-witnesses and non-participants. If it thought there was some concern about what rate Internet radio should have and there wasn't enough evidence, it could have used that. And if the concern was, well, what's some other party going to, you know, who's not part of this proceeding, what rate are they going to pay? You know, they could have defined the category such that they cover the waterfront, and if there was any concern about that, Section 114F1C has a provision that allows new entities to petition and get a rate determination. So there are lots of ways to remove the lack of clarity without anchoring this to uniform rates. On the PRO-IHART deal issue, you know, maybe the judges had problems with it with respect to whether it was a perfect benchmark, but that is not the same thing as rejecting it, and they couldn't permissively reject it as at least evidence that the market is treating these differently. As I said, IHART is basically a controlled experiment in this regard. And, you know, even if it's slightly off, you know... They could reject it as showing what the market does. If they say this is just some tiny corner and it has some other unique factors on the nature of the music being offered, that's exactly what they said. It doesn't tell us what the market writ large would do. Well, it was 20 percent. That was a direct license. That's 20 percent of all IHART deals. That's pretty substantial. And the board, in other cases, has used 20 percent as being a benchmark. And it shows... Wait, 20 percent of IHARTs? Right. And they said before 20 percent of a single entity. I mean, if you have a tiny, tiny entity, they would say that 20 percent... Of course, not many people are going to directly license in a situation where there's a statutory rate. So, inherently, the direct license evidence, there's always going to be a problem with it. And so just saying we reject it for that reason, I don't think it's sufficient. And the PRO is 90 percent of the musical work market. Of course, it's a different rate. There's always going to be some differences. You can't inherently have something that's exactly the same. But 100 percent of all the available evidence treated them as differently, and dramatically differently. The PRO's custom radio was twice as much, double of what Simulcast was. So, that's at least something that's omitted in the record. Even if you say, maybe it was only 20 percent more. Maybe it should have been less and double. That doesn't mean that they should be exactly the same. And there's no countervailing evidence on the other side. And then finally, on this question of promotional effect, there was tons of evidence in the record. We had therein witness Aaron Harrison explaining that all the things about broadcast radio are equally true for Simulcast. The earworm effect, the music discovery, there was evidence that there was tens of millions of promotional dollars that are spent on radio plays with no differentiation made by anyone between Simulcast and broadcast, and zero dollars spent on custom radio. So, there was voluminous evidence in the record. It was all ignored. And again, on the other side of the ledger, there was no affirmative evidence. And I didn't hear any argument as to how, affirmatively, custom radio and Simulcast are the same. Evidence found the opposite, and that at least warrants differential treatment between those two entities. Any more questions? All right. Thank you very much. Thank you. Thank you. Thank you. Good morning. May it please the court. My name is Karin Ablen, and I represent the National Religious Broadcasters Non-Commercial Music License Committee, as they call them in this case. The Copyright Royalty Board violated the Administrative Procedure Act and the Religious Freedom Restoration Act in setting non-commercial webcasting rates that resulted in a huge fee disparity between the only two groups of webcasters that have audiences above an average threshold of only 218 people. That's about the size of an average-sized college lecture hall. The first group of stations are NPR stations. The second group is almost exclusively religious, yet the religious groups pay fees that are multiple times more on average than the NPR fees. They're almost exclusively religious. What percentage? 95%, Your Honor. So 5% are not religious broadcasters. That is true, Your Honor. There is one webcaster. It's a group of 20 webcasters. There's one of the 20 that is not religious. Because religious broadcasters rate, so there's an average disparity of multiple times. There's also a very large marginal disparity between the rates that these groups pay. Does that have an agreement with NPR, or didn't it also include collegiate broadcasters? Collegiate broadcasters are in a separate category. But they had an agreement as well. They did have an agreement as well. So they're getting a different rate than has been set by the board for nonprofit broadcasters, including your clients. Yes, Your Honor. It's somewhat different, although it includes, it is somewhat different. They have lower fees for the same amount of listenership, 218. But that group includes both religious and nonreligious broadcasters. The college group? To the extent that they run student-run stations, that is true. But the important point is, with that group, if they go over that threshold, they are essentially booted out of that group and put into our group. And so even the religious broadcasters and the college groups would end up paying these very large marginal rates. Do any of them go over? No, Your Honor, they don't. So they don't. So the collegiate broadcasters, it's a mix of both secular and religious music, have their own rate, which is less than what your clients are paying, right? But that's not a discrimination, as you would call it, between religious and nonreligious broadcasters. Your Honor, the Tandon v. Newsom case says that it doesn't matter. If there's a group that's treated better, it only matters if there's a group that's treated worse to create a religious discrimination problem under the First Amendment. So the premise of your argument is that NPR is being treated better. But didn't the board find that there was insufficient testimony to make a finding about the comparability between NPR? I just wonder, is there actually a factual basis for you to argue that NPR is being treated better on this record, given what the board found about that? Yes, Your Honor. Our argument with respect to the insufficient comparability testimony from experts is that that is something that the board has never required, particularly noncommercial webcasters in the Web 3 case and also the Web 4 case. The board accepted without question and without expert testimony agreements that have the same characteristics that the NPR agreement has. Not the same rates, but they involve a group of noncommercial webcasters that was negotiated by a representative for them. That is the change on the other side, and the rates were the statutory rates. They were submitted in the course of a rate court proceeding. Can I just ask then, if we think that the board acted within its discretion to say that expert testimony was required, then your Religious Freedom Restoration Act claim fails? Because you have no factual basis to support it. No, Your Honor. The Religious Freedom Restoration Act is an overlay on top of the Copyright Act that creates a requirement that the board set rates for religious broadcasters that are certainly no worse than rates that the board claims. Well, I understand that, but I think the premise of that claim is that NPR was treated better. And the board, as a factual matter, said, we don't know what to do with this NPR evidence because there's no expert testimony. If we say the board acted within its discretion to reject the NPR methodology or comparison, then the factual premise of your RFRA claim fails. Because there's no finding that NPR is being treated better. There's no basis to find that NPR is being treated better. Your Honor, the government in its brief admitted that our group was paying more than NPR stations. But any way you slice it, whether it's by average fees or marginal fees, which are 17 times higher at the margin once our clients go over that threshold of 218 listeners, which is a pretty small amount, if they go over that, they're paying 17 times more than NPR stations. And again, the government admitted that in its brief. But there is a difference in the fees that these groups are paying. And the government... How many go over that threshold? I'm sorry? How many go over that threshold? Your Honor, out of it, so 20 webcasters in the record evidence have gone over the threshold. 19 are religious. And while that sounds like a small number compared to the well over 1,000 stations or webcasters that are within this noncommercial class, including all of the noncommercial webcasters, but yet the 19 religious broadcasters, if you just look at their usage fees, not even looking at their minimum fees, they're paying the substantial majority of all fees that noncommercial webcasters pay. It's well over 50% just for this usage category. And that's because the rates just skyrocket once this threshold has been hit. So with respect to the APA and talking about the NPR agreement, we recognize that the board does have discretion in how it chooses benchmarks. But what it cannot do in looking at one benchmark over another is apply a test that's been in place for a long time and then change the rules without explaining why, without even acknowledging that they're departing from their precedent in other cases, and that's what happened here. They had a comparability test. And it was from Web 1. It's been carried through. It was cited in Web 3 and even in a very recent satellite radio proceeding. And that test says that in determining whether a benchmark is comparable, the judges consider such factors as whether it has the same buyers and sellers as the target market and whether they are negotiating for the same rights. That's in the satellite case of 83 Federal Register. Such as. Such as. It's not an exhaustive list of things to be considered. Well, if you look at the analysis that all of these cases have done, when there has been an analysis with a noncommercial rate sometimes, there's not much of an analysis. These are the factors that are looked at in Web 3. For example, there's lots of testimony about an agreement that NAB reached with SoundExchange, another one that Sirius Satellite Radio reached with SoundExchange. So, again, they have these same attributes of agent negotiations. You know, a trade group negotiating on behalf of buyers, for example. And the board there, they applied this test. They said same buyers, same sellers, same rights. And what's interesting here is that the NPR agreement, unlike a lot of other agreements that the board does look to, involves the exact statutory rights that are at issue. This is the type of agreement that when the DMCA, when this statutory license was first created for this type of webcaster in 1998, that is the type of agreement that the judges, that Congress specifically invited, not required, but invited the judges to consider. It was agreements that were submitted to the judges for statutory breaks. Do you want this agreement to be used, even assuming there was some type of crosswalk to translate it, the lump sum, into royalty rates? Just to be clear, your position is that the board should have set a rate for members of your trade association? We have two alternative proposals, Your Honor. Yeah, put aside the lump sum one right now. And as to having them set a rate, they were supposed to set a rate for your trade association members. Yes. What in the statute allows, put aside the lump sum one for this question, all right? What in the statute or precedent allows the setting of a rate for a single trade association group within a type, a category of webcasting? Well, Your Honor, the copyright royalty judges have the obligation to set rates, certainly, that cover the universe of noncommercial webcasters. Our proposal included another rate to cover people not in the universe. The class that our religious broadcasters cover are more like NPR, and that's why that was one of our alternative proposals. My question is, again, it's a different one. What is the statutory authority, precedent or statutory language you can point me to, for setting a singular rate for members of a trade association that doesn't apply to everyone else within the category? Your Honor, I said that lump sum proposal. I'm trying to separate the two. You can answer the lump sum one second. But you had two arguments here. Lump sum proposal or set a rate that parallels the NPR rate. And that rate would have been for members of your trade association only, correct? Correct? Yes. Okay. What is the precedent authority for the board to set a rate under the statute or precedent? What is the authority to set a different rate for members of a trade association within a category? I would phrase that a little bit differently. I don't want you to phrase it. I want you to tell me the source of your authority. Is there statutory language or a case where this has happened? The judges have authority to set rates for everyone, and there is nothing in the statute that prevents them from setting different rates for different types of groups. No, no, they have to first find. I mean, this is the prior argument we had. They shall make distinctions between different types based on criteria that you're not arguing about here at all. So is there a case? Is there statutory language that says, apart from the language about breaking licenses based on different types of webcasters, that even within a single type we can break it up more and give a different rate to a trade association just because they're members of a trade association? Well, Your Honor, that proposal, we don't believe it is a different rate, and the reason we included it is because it mirrors the NPR metric. That is why it's in there. The NPR metric comes from a voluntary agreement. It's not from a statutorily set rate. You argued for a statutorily set rate. The NPR rate is a statutory rate. It is not a private settlement. It was agreed to voluntarily by those parties, but then it was submitted to the judges for adoption. Yes, and they have direct statutory authority to approve rates agreed to in a private settlement agreement. You don't have a private settlement agreement, correct? No, we don't. Okay, so you are in the other category of where they statutorily calculate a license rate. Well, just to be clear, this agreement is not a private settlement agreement because the NPR agreement, because it applies to non-parties to that agreement. It was adopted as the basis for statutory rates for an entire class of webcasters. Our group of webcasters have different characteristics from other types of non-commercial broadcasters that may not need an additional threshold. But when you have the two only groups that are large that go over a very modest listenership, that's why we included two proposals, and the lump sum included rates that also are similar in effect, we believe, based on the evidence to the lump sum. Didn't the board make a finding that the NPR rates that you're basing this argument on were the wrong NPR rates? Were the wrong NPR rates or outdated? I'm not sure what you're referring to, Your Honor. The NPR agreements that we relied on were those from 2016 to 2020, which was the then current term when the case was proceeding, as well as the 2021 to 2025 agreement. And we relied on both of those. And if the judges below did not like that lump sum, they could have also looked at a document which they completely ignored and said they were barred from looking at it. It said JA-16-16. That's the spreadsheet? That is the spreadsheet. And that spreadsheet, there were two reversible errors with respect to it. The first was that spreadsheet, as the judges said, was backward-looking. It was not backward-looking. It was forward-looking. And if you look, I just refer you to JA-16-16 since it's restricted. There are markings on that document that make it forward-looking. But more importantly, when SoundExchange produced it, and none of this was talked about in the determination, this was produced in response to a discovery request for documents that valued the components of the NPR agreement starting in 2016 going through 2025. And when that document was produced, it was characterized by SoundExchange as an analysis of value of those settlements, of the settlements that started in 2016. The judges found that they couldn't look at it because it was backward-looking and did nothing more than repeat rates from the earlier time period, which was covered by the Webcaster Settlement Act, and those rates would be non-precedential. But to say that numbers that come out of an agreement that's non-precedential but then are used to derive a new agreement that is a precedential agreement is reversible error and is contrary to the registers finding precedent, the decision that she issued a few years back that we cite in our briefs. There are non-commercial religious webcasters that are not a member of your group. There are ones that we do not represent. Any questions? All right. Thank you very much. We'll give you some time for rebuttal. Thank you. Good morning. Again, you're on your stand on behalf of the Copyright Royalty Board. I'd like to, I think, start with the basic proposition that the RFRA argument that the religious broadcasters have made only comes into play if you agree with them that the NPR settlement agreements reflect a lower usage fee than the one that they proposed. We did not admit that they do. In fact, our entire brief was dedicated to explaining why the judges found that they don't actually know what the usage fee is that's reflected in the flat fee agreement for NPR. And so unless this court finds that the judges erred in that respect and they should have found that we could identify the usage fee in the NPR agreement, there's no occasion that the entire underpinnings of the RFRA argument fall apart. With respect to the religious broadcasters' arguments about whether the judges should have accepted the NPR settlement as a benchmark, the judges' decision was very thorough in their explanations of all of the many reasons that together led them to reject this settlement agreement as a benchmark, starting most fundamentally with the point that the flat fee agreement contained within the settlement was not what the religious broadcasters were proposing. I mean, even their flat fee agreement had factual differences from the NPR agreement, setting aside the legal question of whether the judges could even set a rate that applies to a trading organization without strong economic data showing that we should actually differentiate on that basis. And with respect to their alternatives of the per play of a threshold rate, it required some very intricate extrapolations from the data that I'm happy to answer specific questions about, but I think it was well within the judge's discretion to say we're not confident that the usage fees you're proposing are actually reflected in this flat fee agreement. And that alone is fatal to their case. Any other questions? There are no further questions. We will rest all the briefs. Thank you. Okay, Ms. Adlin, we'll give you two minutes for rebuttal. Your Honor, first, the government did admit on page 85 of their brief that the rates are higher for our group than for NPR stations. And those are the rates, no matter how they are structured, that we are seeking, whether it's by our threshold structure or by our lump sum structure. But regardless of what they said, if the record doesn't support it, if the record doesn't support that the NPR rates are lower, then your claim fails, correct? Well, I refer, Your Honor, also to our opening brief, page 9, where we show that the record evidence that came in was for the year 2018, and we showed that that group, that group that's above the threshold, is paying multiple times what NPR stations are overall. But if the record demonstrates that the board determined that the NPR agreement, they didn't find that NPR is paying a lower rate, then your claim fails, right? I don't think the board found that, Your Honor. The board found that our expert did not put in sufficient comparability testimony. But again, that conflicts with loads of precedent, and that the adjustments were not, that we should have made adjustments to it that were not made. But if there's no finding that NPR is paying a lower rate than you, then you don't have anything to rely on to make your legal argument under RFRA. Well, Your Honor, the rates are public. The NPR rate, you can easily calculate it. It's extrapolated. It's an extrapolated rate from a lump sum. You've made it into a rate. And so if there's no factual support for your assertion of what that rate is and that it's lower than what you're paying, then your RFRA claim fails. Well, again, the rates in the agreements can be extrapolated, or it's simple division. There's an average APH rate that you can easily, you take two numbers and divide them. Should we be doing that as a court? Well, it's certainly in the records to do. The NPR agreement has price metrics, and from the price metrics, there's a per every hour of music rate. And if you compare that to what happens to our clients, they... Well, I think what Judge Penn is asking is, are you asking us to make a fact finding that the board did not? Well, Your Honor, the board didn't reach this point. So are you asking us to make a fact finding? You say it's there in the record, and basic math can do it. So you're asking us to make that fact finding, which is critical to determining whether or not you're being treated differentially, your clients? I wouldn't characterize it as a fact finding, Your Honor. It's simply a... What else is math? It's the agreement itself has price metrics, and in that agreement, whether it's by a threshold structure, which documents... What would you call it if not a fact finding? It's just the price of the agreement. That's a fact. That's a fact. But it's in the record, and again, the government admitted that NPR was paying more. We showed that NPR was... I'm sorry, that we were paying more. We showed that, and... The board didn't find that. Did the board find that? The board rejected... At a minimum, Your Honor, the case should be remanded because... My question... Sorry. If you can just answer this question, I think it's a yes, here's the site, or it's a no. Did the board find that your clients, the members of your trade association, were going to be paying a higher rate than NPR, those covered by the NPR agreement? I don't believe they said those words, but it's clear from the agreement what the effect of both of these structures are. And if I can just have one more half a minute to talk about the lack of substantial evidence. So regardless of what our proposal was, and regardless of how the board treated that, it wholly lacked substantial evidence to support its own determination. It relied on only three components in finding that it was outstanding exchanges rates, and that's a J1362-64. It was the Web 2 determination, which is old and based on NPR evidence. And the judges in this case have said at JA 1224 that each case is a de novo proceeding that needs a record in that case, and that there's no a priori reason why rates from an earlier case, Web 4, for example, should resemble Web 5 at JA 1224. The only other two components where they adopted reasoning were a solely seller-side testimony, Mr. Orzag, that he based his testimony only on seller evidence and also, incidentally, relied on... You need to wrap this up here. You're way over your time here, so you need to wrap up quickly. Okay. He relied on settlements, and the board adopted that. So the board is acting arbitrarily by relying on settlements with respect to sound exchanges case, but then throwing ours out and treating them very differently. Thank you. Thank you very much. Thank you. Thank you. Good morning, Your Honors. Thank you, and may it please the Court. I'm Matthew Hellman on behalf of Appellant Sound Exchange. This is a case where the underlying math may be complicated, but the critical legal error is straightforward. The CRB is obligated to set a royalty rate that a willing seller would accept, but no willing seller would accept a rate below its opportunity cost. No one would give up more to accept less. The government agrees, yet that's precisely what the CRB did here. It set a royalty rate of 2.1 tenths of a penny per streamed song, despite crediting evidence that every one of those streamed songs, every one would cause record companies and artists to lose out on 2.22 tenths of a penny in royalties from other music services. In other words, the CRB set a rate below opportunity cost, a shortfall worth tens of millions of dollars over the rate term, and no willing seller would accept that. But the problem is worse than that, because the 2.22 opportunity cost figure itself is too low. The unprovided record shows that that is only a part of the record company's opportunity cost. The CRB simply forgot to address the rest of the opportunity cost evidence in this case. Second, the 2.22 figure is itself based on a faulty calculation. The CRB, nor any other party, disputed that the calculation was faulty. Instead, the CRB contended that the error wasn't identified in the record. But it was. It's right there on pages J, 613 to 614. So what does the government say in response? Can I ask a question? Please. The board here relied... The evidence you're talking about is all from the game theory modeling, but the board ultimately rested its decision on a benchmarking analysis, and chose a benchmarking framework. So just, we're not doing the game theory stuff, we're doing benchmarking. And the board has, I think at least twice before, said that, given the way benchmarking works, agreements that actually happen between million sellers and million buyers, opportunity cost is already baked into any benchmarking analysis. Do you disagree with that proposition? I don't disagree that a board could take a path like that and... Could take a path like what? What I said is the board has found that when we look at benchmarks, do benchmarking analysis, opportunity cost is already baked into whatever the benchmark is that we choose as appropriate. Yes, that proposition, I'm not here to dispute that. And you don't dispute it in this case either. We're not here to dispute that in this case. But that proposition does not decide this case because of the path that the board took here. The parties put in enormous amounts of evidence on opportunity cost,  and everyone here agrees that it would be error to set a rate, a willing seller rate, below opportunity cost. But the board did not say, although I think my friends on the other side tried to recharacterize what it says, is that looking at all that opportunity cost evidence, the evidence of the part that they left out, the error that they said was not inside the record, when you look at all of that, we're comfortable that the benchmark rate is still appropriate. The board never made those kinds of findings. It never addressed it. It simply skipped over it. What the board did say after pages and pages of analysis was... I'm confused about this whole point. I know you've got your things that I talked about, the opportunity cost as adjusted. But you said they didn't say that the benchmark in this case necessarily included opportunity cost? Just like I thought you said you agreed with that as a principle and you didn't challenge it here. Did you argue below that this benchmark that they used here was somehow deficient in that it didn't capture opportunity cost? Yes, Your Honor. You argued that this benchmark did not capture opportunity cost, even though you thought you just agreed with me that benchmark analysis necessarily has taken to an opportunity cost and you weren't challenged as a general principle or in this case? What we contended was... We were arguing for a higher rate, obviously, a higher ultimate rate. Of course. Not just the opportunity cost, but a higher ultimate rate. We contended, as the board has recognized as well in past proceedings, that a willing seller rate cannot be set below opportunity cost. Of course. Okay. Let me see if I can take you to the next step of what we presented. So we put in a lot of evidence on opportunity cost. So did our friends in the proceeding. And the board then, for reasons... Because the board had a lot of opportunity cost as a floor, I think is the word that the board used in prior proceedings, for setting a willing seller rate, the board purported to make a finding as to what that opportunity cost is. Now, the board never said, despite that opportunity cost finding being X, or .222 on page 200 of the opinion, they never said, nonetheless, we accept this 2-1 number, notwithstanding that, based on the principles that you're talking about. They simply didn't do the analysis. And they weren't consistent. Why do they need to do it if they've said in the past, and you haven't challenged that precedent, that a benchmark agreement necessarily captures opportunity cost? There was a lot of fighting about what the opportunity cost number was. And they said, here's a benchmark agreement. We're going to assume that the people that had an agreement there weren't silly. They didn't agree to something that didn't cover their opportunity cost. It's necessarily baked in. They've said that before. You haven't contested it. It's established. Why do they need to say it again? This all falls under the rubric of what we would call reasoned decision-making. Having found that the opportunity cost in this case was .222, they are under an obligation to explain why they're setting a rank above that opportunity cost. So everything in your case hinges on whether the record establishes that the board conclusively found that the opportunity cost in this situation is .22. And so if there was a benchmark agreement that was less than that, that must have been the freakish benchmark agreement that didn't have baked into it opportunity cost? No, I don't think so. Okay, what am I missing in this stuff here? Because we've got this benchmark agreement, and we all agree that's where the number came from. It didn't come in error when pulling the number out of that benchmark. And so they've got the benchmark. It had this number, and we agreed that that would have had baked into it opportunity cost. And so this is what I'm getting confused. You're up here on the game theory number, and they're over here going, we're done with that. We're going with the benchmark route. Opportunity cost is already in there. Right. We're done. What's wrong? What am I missing? With respect, what I think is absent from that account is it wasn't just us over there in opportunity cost land. The board attempted and purported to decide what the opportunity cost, the relevant opportunity cost in this case was. If the board had wanted to simply do that. But they might have said, under game theory, all this stuff has to be adjusted, and if it all got adjusted, here's what the number would be. But having done all this, we're not going with game theory approach here to setting the rates. We're doing a benchmark analysis. At which point, we don't need to separately find opportunity cost. There's no error there. Well, there is an error. I think the way you pointed it out, Connor. There's a difference between the rate that game theory produces and the opportunity cost input that you use to ultimately calculate that rate. We're not here to say, our argument on the appeal is not that they needed to adopt a game theory rate. That's not what we're here arguing about. But our argument is that in a world, sorry, in a determination where the board does address opportunity cost, as it has in the past in S.R.S. 3 and other determinations, it is irrational and it is arbitrary to say, on the one hand, it would be, no loan seller would accept a rate of opportunity cost to find what that opportunity cost is, not in a messiah or in a frolic or a detour, but in pages and pages. No, it's the same procedure. There was another two minutes of analysis and I did that one. And then I said, we're going, having worked through that, we've had to do a lot of work on that, we're going with the benchmark. Is it your view that the benchmark that they adopted, which had the 0.0021 rate, that that benchmark was somehow fatally flawed and that that benchmark agreement did not reflect, in establishing that rate, did not cover the opportunity cost of those buyers and sellers? Is that your position? The benchmark agreement is what it is. No, no, no, no. I'm not asking you what it is what it is. I'm asking you, so I think your position has to be, if you say we have to go look at this other opportunity cost number, it has to be that the benchmark they chose didn't already reflect opportunity cost. Don't you have to show that? I do understand the question. And the best answer I can give you is, to the extent that benchmark reflected opportunity cost and turned into, in the market, there's all sorts of adjustments, of course. The board also had in front of it other, in fact, other evidence of opportunity cost, most of which, a significant portion of which it forgot to address. And it is not reasoned decision making. Just have the principle that you shouldn't step below opportunity cost. I think we're all in agreement on that. And then to do the analysis halfway with doing a lot of analysis, taking advantage of the 222 number, but then failing to address the other aspects of opportunity. It's not like the board said, you know what, that other aspect of opportunity cost, we're still comfortable with the benchmark rate. They never said that. They never addressed it. They never said that Professor Willig's pointing out of a further error in that number was wrong or not worthy of consideration next to the benchmark. They never considered it. And it's that kind of pathway. Can we go to the calculation of what you say is the opportunity cost? Yes. Because my review of that record is there were pages and pages where they started with Dr. Willig and then they made adjustments based on Dr. Shapiro. Yes. But it seemed to me as I read through it all that the board sort of enumerated a bunch of problems with Dr. Willig's testimony and said we can adjust some of them this way. Yes. And if we made the adjustments, the number would be this. But there were several problems they identified where there was no adjustment for them. And those were the complementary oligopoly effect discussed at JA 1312 and the opportunity benefits discussed at JA 1310. Right. And then the board said so, you know, this is just a guidepost. This is not the opportunity cost number because the number they came up with did not account for these problems. So in light of that, isn't that a weakness in your argument? Because you're saying they definitively found the opportunity cost and set a rate below it. But they didn't definitively find an opportunity cost because there are two factors here that were not reflected in the number that you are pinning as the opportunity cost. Yes. Let me answer that question in two, possibly three parts. The first part is just to go back to Judge Millett's point. This is the board attempting to do something but not getting it right. And that's the error that we're complaining about here. They thought this was important and the adjustments that Judge Pan talks about aren't enough to save them. And now let me talk about those two adjustments. Opportunity benefits. That is the concept that if there wasn't webcasting, fewer people might be listening to music. Therefore, with webcasting, more people will end up paying royalties to the webcasters. Perfectly sound point. We couldn't agree more. Our expert dealt with that in depth in his survey, which asked people if there was no webcasting, what would you do? You could say I don't listen to music at all. You could say I listen to FM radio. None of those provide royalties. All of that was taken into account. None of that was addressed by the board. Well, the board made some adjustments to the opportunity cost number. And you're telling us we have to take that number as the gospel. And all I'm saying is that that number doesn't take into account other flaws that the board found, regardless of how they dealt with the flaws. This number that you're trying to rely on is not the relevant number if it doesn't account for flaws that the board identified. That means it's not the number that the board chose as the opportunity cost number. And the true opportunity cost is reflected, as Judge Millett says, the one that's baked in to the rate that they ultimately chose. It's a different rate. Yes, Your Honor, but that sets up a question, which is they came to a spot, and then did they have good reason to move further from that spot? You just gave two reasons that the board offered for doing that. If those reasons are irrational, not supported by the record, if they said they also failed to account for, excuse me, the price of motor vehicles, something irrelevant, we'd all agree that's not a basis for moving down. But I think they just said that we don't have a way to adjust for these. They did say that, but if I could, if they said they didn't have a way to adjust for the price of motor vehicles, that still wouldn't make it a good basis for finding to go downward. And with respect to opportunity benefit, what I'm saying to the court is the thing they are talking about is completely, we agree with it, and the evidence in the case addressed it, and they did not. What about the complementary oligopoly point? Sure, complementary oligopoly point. Two points there. The point that my friends focus on has nothing to do with opportunity cost, the passes they discussed. We talked about this in our briefing. Look, here's what catches my eye, so just to cut to the chase here, all right, and this is in the public record 497, CA 497. That's because the royalty rates derived from Professor Willig's Shapley value model, which obviously is where the opportunity cost came from as well, reflect complementary oligopoly power even as adjusted supra. So that's the Shapiro adjustment. They must be discounted to reflect effective competition. However, the judges find nothing in the record to estimate the value of an effective competition adjustment. All right, so it seems to me that that rather blows up your argument that they said even if adjusted, which is your .222 number, there's zeros in front of it, I don't want to repeat it, even if that, it's not good. We can't rely on it because he didn't take care of complementary oligopoly. Yes, here they're talking about rates, but the rates necessarily included the opportunity cost. And so if the rate was too high, it had to go down more. And secondly, when you say they had no business going over here and going down in the benchmark analysis, it was begging the very question of whether they went down from opportunity cost because the buyers and sellers that were part of that benchmark agreement thought they were covering their opportunity cost. So I don't think you can make the down point when we don't have a basis here for finding a higher opportunity cost. And so that language on 497 I'd like you to address for me. Yes, so that's page 203 of the determination? I don't... That's what I have it as. Yes, page 203 of the determination. Right. A couple of answers to that, Your Honor. Yes, that is what they say, and they say even as adjusted, it needs to go down further. That's correct. And we can't take it down further. There's nothing in the record that lets us take it down further. That's their next sentence. Yes. Okay. So that is the frame that I think the courts should be understanding this case. They came to 222, and then they said this thing, which you're pointing to. The government doesn't actually emphasize this very much, but nonetheless, it is what they say. Now, it is not reasoned decision-making to have come to the 222 number given one reason which just simply is not substantial, and then to say what you're saying there. There's no quantification of this downward adjustment. There's no attempt to say how far below 222 it goes. But they say, nonetheless, they think something, there's like a tug down. All right. But there's tugs up, too, that they don't address. Excuse me. I understand you want to refight the record here, but here's your whole argument. Again, I said it depends critically on a determination that the board found rock-solid finding of an opportunity cost that was more than the benchmark rate. And there is no rock-solid finding. You didn't even say any opportunity. You said Professor Willink's as-adjusted opportunity cost. There is no finding of a rock-solid opportunity cost. This page says the opposite. Even as that adjusted number, which is the one your argument has relied on, it still can't work for us because of the oligopoly thing. And so you know what we're going to do? Tell me how this is not reasoned decision-making. True. We've done this, and now we can't figure it out. We'll give it guidepost status, but we can't come up with an opportunity cost number through this game theory on this record. We can't do it. Right. The Willink one, anyhow. It's the only one we're talking about. And so you know what we're going to do? We're going to go over here. We're going to do a benchmark. And benchmarks, everyone agrees, already have opportunity costs baked into them. And so we don't need to resolve that number. It's already baked in. Done. What's unreasoned about that? What is unreasoned about that? I was struggling to think of a metaphor while you were laying it out, because I do understand your point, Your Honor. But what is unreasoned about it is, I hope you'll allow me to get this out, this 2-2-2, maybe it's not rock-solid. Maybe it needs to go down further. Maybe there's some problem with it. That's what they say. We disagree with that, but I'm not here to be poignant about that. But it's unreasoned to say, let's just pretend for a moment that there was also record evidence that was under-budget, that there was another 3-3-3 of opportunity costs in the record. Let's just say for the moment that was what the record showed. If the board failed to address that upward aspect of the opportunity cost, that would be unreasoned decision-making. Why? They don't have to find the opportunity cost number. That's why I said we don't have to find it, because the benchmark has already done it for us. What's unreasoned about that statement? It's unreasoned because they don't know how far down from the 2-2-2. It doesn't matter. The benchmark has already solved the answer to the question for us. It's baked into the benchmark number, which you agree at the beginning of this argument. I don't think... That's where I'm getting, that's where my confusion is. I don't need to spend... We've spent hundreds of pages on this. We don't need to spend more. It's not working for us. You agree. The board agrees. Benchmark covers opportunity cost. That's where we're going. Done. What's unreasoned? What is unreasoned is having... Having attempted to determine opportunity cost, which they did, and then to say that they're comfortable just moving to the benchmark because of problem X with the opportunity cost analysis. X is a downward pull on the 2-2. It comes... The 2-2 is too high for some reason, for this reason that they did it. Okay. Let's just assume that that's correct, which again we dispute, but just assume that's correct. It is unreasoned if that opportunity cost is actually significantly higher. We don't know what... The government wants this court, I believe, to say the following. Something along the following lines. It doesn't matter that they ignored the other upward evidence of opportunity cost because they found this 1-2. I think only 1 is serious here. One downward cut. But the board was justified as ignoring the rest. That might be if that's what they did. But instead, this is the part I'm not hearing an answer from you. Sure. Because what they said is, I don't care how many up and down there are. We can't solve this thing. We spent 100 pages. We can't solve this thing. We can't get the number. But we have door number 2 here, and it gives us a rate. That includes opportunity cost. No one disputes that it includes opportunity cost. So we're going with that. They're not failing to find opportunity cost. They're not ignoring up or down. They're saying, you know what, let's let the market tell us what rate covers the opportunity cost, and we're going with that. What's unreasoned about that? Well, there's really two components to that, Your Honor. If somebody wants to argue that the 2-2 number that gets you after doing a lot of math with a lot of evidence is wrong, then you would expect them to come forward with some evidence quantifying, or even attempting to quantify, what the problem is. We don't know if this is a millimeter problem, a meter problem, or whatever problem. None of that's there. And even the government says it's an unquantified downward adjustment. What is quantified are the upward adjustments that the board ignores. So your position is the opportunity cost that was baked into the benchmark. I just need a yes or no. Yes. That the opportunity cost that was baked into the benchmark they chose was not the true opportunity cost? That benchmark did not incorporate opportunity cost. Because here on 8K review, this is my answer to your question. It was error for the board to go where it is on the 2-2 and then say, ultimately, we don't need to use this because it goes down anyway, and we can use the 2-1 without looking at the things that bring it back up. That is error. No, no. That's only my answer about the benchmark. The benchmark rate that they chose, Did it or did it not cover opportunity cost? It did not cover opportunity cost as the record showed in this case. Okay. And so when you said at the beginning you agree that benchmarks automatically have opportunity cost baked into them, and you weren't disputing that in general or in this case, that's wrong. You are now arguing, and I did not see this in your brief, I didn't see any attacks on their benchmark analysis, but it sounds like your argument now is that there is something wrong about that benchmark that it did not cover opportunity cost. Is that where we end up? Yes, although I think this is the central argument of our brief. If you want to say that the benchmarking analysis has some sort of opportunity cost aspect baked into it, that's not what the board said, but let's just go with that for the moment. There is other evidence of opportunity cost in the case, higher, significant evidence of opportunity cost. It is a failure to engage in reasoned decision making to explain why that other evidence isn't the evidence you go with. If the board had said sort of what you're saying, which is there's a lot of stuff out there, there's this, there's this, there's this, and ultimately we can't rely on it because we don't understand what it is, these pieces of evidence, the part that they left out, and move on to something else as a superior measure of opportunity cost, I probably wouldn't be up here, or at least my argument would be very different. But when you have, let's just accept for the moment, multiple indicia of opportunity cost, and you're going to pick one, and again, that isn't really how the board put it, but let's again say that that's what they said. If you're going to pick one, you have to look at everything. You can't do the analysis halfway. And that's what the board did here. And I don't hear my sons on the other side say, no, they did in fact consider the other parts of opportunity cost, or the board did reject on the merits the errors that we pointed out. All we are asking for is that if they're going to do an opportunity cost analysis, they do it completely, and not only look at some of the evidence, but all the evidence. And that's why it is not reasoned decision making, and why the purported decision to adopt the benchmark as sufficient evidence of opportunity cost isn't a reasoned decision, because you've got to compare it to something, and you didn't compare it to the whole record. Any questions? Thank you very much. Thank you. Good morning, Your Honors. Jennifer Butrek, once again. I think it's important to start by emphasizing what the only issue on appeal that subject change has raised is. And no one disputes that the rate that judges picked was based on a benchmark model and not on a game theory model. No one disputes that opportunity costs are baked into benchmarks, because real world actors are presumed to make rational decisions when they're agreeing to these licenses. And nor has sound exchange actually directly challenged the benchmark that the judges rely upon. So the bottom, the only argument that sound exchange has made in this appeal is premised on the fact that in sound exchange's view, the judges made a factual finding about opportunity costs that was ultimately inconsistent with the rate they derived from the benchmark. There's no finding in this record. As our brief explains, the judges analyzed the game theory evidence and the game theory models that sound exchange presented, identified multiple problems with the opportunity cost calculations within that model. And the only sentence in that lengthy decision that sound exchange quotes in this court is a sentence that says the judges accept an adjustment by one expert, but that doesn't account for the various other problems with the opportunity cost adjustments. And once we accept that, there is no finding, then the rest of sound exchange's argument falls apart. Because there's no factual finding about opportunity costs, there is no argument that this is arbitrary and capricious. There's one other thing that I would like to mention, which is that there's sort of a new flavor of argument that was raised today at the podium, which is that sound exchange suggests that perhaps the judges should have accepted that 0.22 instead of relying on the benchmark. But that's not an argument that was raised in the opening brief, and I don't think it's necessary for this court to address that, because this is not the actual argument that they have made for this court. And also, again, to actually make that argument, they would have to show that the benchmark on which the judges rely would somehow not adequately address the opportunity costs that are understood to be based in. For all those reasons, we don't think that there's any reason to doubt the judge's decision as to this part of the appeal. And we would ask that you affirm. I'm happy to answer specific questions on that, but otherwise we would rest in our briefs. Thank you very much. Thank you. Hello, Your Honors. I'm David Mattern for Intervenor Google. So I'm going to use my time today to emphasize two points. The first is drawing on something that it seems everyone agrees on, which is that the board here ultimately relied on the benchmarking approach. Benchmarking necessarily fakes in opportunity costs, as the board has found in two other decisions. Here, one point I want to add is that what the board had to do was decide what is the rate a willing buyer or a willing seller would find in an effectively competitive market. The board didn't have to find what opportunity cost was. It just had to find what satisfied the willing buyer or willing seller standard. And it decided that the benchmarking analysis of Google's expert, Dr. Peterson, satisfied that standard. I think that alone is enough to reject SoundExchange's appeal here. But I'd like to also emphasize just two reasons on merits why SoundExchange's appeal fails, but are just a little different than some of the reasons the government emphasized. So SoundExchange, as they have set up their argument, has construed the board's determination as just rejecting, or sorry, it's just applying the complimentary authority power of the record labels at sort of the end point, at the output point of Dr. Woodley's model. And they say that the issue here is that they shouldn't make any findings about how this applies to the input point when you look at opportunity costs. And that's just wrong. And Judge Pant, I think when you asked this question to the government's attorney, you really come in under the two pages where the board does this, which is day 1310 and day 1312. And this is when the board is discussing the four-finger road approach. And I realize that this terminology maybe isn't obvious to a reader about what it means, but four-finger road is the term that Dr. Woodley used to describe a choice for whether he should adjust his opportunity cost model to account for the complimentary authority power of the record labels in the interactive streaming market. And to sort of unpack this, what Dr. Woodley was doing was saying, okay, well, if you're making non-interactive streaming service, what's the cost because it would sort of divert away streams from the interactive market? And Dr. Woodley said that, okay, we're just going to accept the rates in the non-interactive market as they come and not make any adjustments to account for the fact that the rates in the market are inflated by the record labels complimentary authority power, which is something the board has found in a number of cases and something that this court also talked about in the Johnson decision from a couple years ago. And so Dr. Woodley said, no, I'm not going to make that judgment. And the board squarely rejected that when it said that his broken-the-record approach fails to account for the complimentary authority power. And this is just about opportunity cost. It's not about the surplus value. It's not an exchange. I think it speaks volumes. It doesn't address these pages at all in its opening brief or its reply brief, even though it's discussed extensively in our brief intervention. And I think just to sort of add to that, the board confirms this in footnote 279 where it also says that, hey, in addition to the problems we're discussing here about sort of surplus value, the board has-sorry, Dr. Woodley has failed to consider the opportunity cost problem because of the broken-the-record approach invalid. Questions? No. Thank you very much. Thank you, Your Honor. Mr. Hellman, I'll give you two minutes for rebuttal. I'll be brief. I think there's just two points that I want to try to get across in my time here. On this concept of whether or not the benchmark agreements capture opportunity cost, I just want to be sure that we're all-I'll be responsive to your question for being accurate about this. Yes, real agreements do necessarily capture opportunity cost. Otherwise, nobody would enter into those agreements. But, of course, those agreements set a rate for which the opportunity cost might be- Less than. Less than, right? Necessarily less than. Less than or equal to, correct. So-but when you're doing a benchmark analysis to set rates in this proceeding, you take the rate over here and then you try to figure out, well, what do we need to do to adjust it to be a worthy rate over here? You're not adjusting for opportunity cost. You're adjusting the rate based on all the different features of the market, the functionality of this service versus that service. Opportunity cost isn't what you're solving for in that area. You're just trying to figure out what the rate is based on the difference between the benchmark market and the market that you're solving for. So opportunity cost doesn't carry over in some even way. The evidence of opportunity cost in this market was what Professor Lord put in, what Professor Shapiro commented on, and what the board parsed. So you can't- You submitted a benchmark analysis as well to the board, correct? We did submit a benchmark analysis. Did you tell the board that you can't just adopt this benchmark? You can't do that. That would be unreasoned decision making because you're going to make some adjustments and so you're going to have to make a finding on opportunity cost. Our benchmark exceeds the opportunity cost. No, you said there's ups and downs. There's ups and downs that weren't determined. That's what you said. There was some downward pressure. There was upward pressure. That wasn't determined by the board. So we don't know. No, we don't know what the final number is. They were arguing down. You said, well, there's some ups. We don't know what that difference was. So did you tell the board, here's our benchmark, but you will also separately have to find, through game theory, the opportunity cost before you can adopt our benchmark because you're going to make adjustments to our benchmark. Did you tell the board that? Yes. You did? Where did you tell them that? Well, these are the things we said to the board, which I think are telling them that. Obviously, you can assess. One, we had our benchmark. Two, we had our opportunity cost estimate. And three, we took the position that a willing seller would not pay below opportunity cost. You told them they could not adopt a benchmark without first solving the math problem over here under game theory. They could not simply do a benchmark analysis. You have to do both. You have to get opportunity cost. And the only way to get, and this is the premise of your position, the only way to get the accurate opportunity cost is going through the game theory process because the benchmark itself isn't reliable because you're going to make adjustments to it and, whoops, you might get below opportunity cost. That's your argument. Am I understanding that correctly? Well, what we said was... No, no, tell me what... I think you're saying it correctly, but... You can't do benchmark itself because you're going to use some of the benchmark and one knows we're going to noodle with it, right? Right? Well, you can... If you accept our... What we said was, here's our evidence of opportunity cost. It's here. You should reject any benchmark that results in lower, a rate below that opportunity cost. You should accept our benchmark analysis because one of the things it has going for it in its favor is that it exceeds the opportunity cost number. So that was our position to the board, which I think, again, isn't really disputed here. The only question is, is this a rate below opportunity cost? What was the rate in your benchmark? Your Honor, I'm going to have to... Was it 0, 0, 2, 3? I think... Yeah, it started with a 3. There was a 2. We were a tenth higher. Okay. So we were significantly higher, Your Honor. And that's all the piece, and that was our submission to the... So the board's error here was it had to finish the game theory job before it could pick a benchmark. The game theory job that I'm referring to is find the opportunity cost through the record created through the game theory model. The board's error here was, to the extent you read the board as saying something to the effect of, we're comfortable with this benchmark rate because it doesn't violate the principle that the rate needs to be set at opportunity cost or higher. To the extent you read that as what they're saying, which is not what they say, but to the extent that's what you read them saying, that is unreasoned because they ignored opportunity cost evidence. And again, my friends, I'm not disputing that they ignored it. They're just saying it's okay for them to have ignored it. And it is okay for them to have ignored it because how can you say something satisfies an empirical test when you don't know what the number is? And that is the proposition that my friends on the other side are saying. It's okay for that to be the case. And that is a reasonable decision to make. Any other questions? All right. Thank you very much to all the attorneys. We appreciate all the hard work and thought into the brief and interim arguments. The case is submitted.
judges: Millett, Wilkins, Pan